# ASSIGNMENT OF CONTRACT

Assignment of Contract made as of the ___ day of ~~December~~, 2005 by and

between RONALD A. SCHECKTER, having a mailing address at PO Box 402, Bedford,

NY 10506, as Assignor, and TOLL BROS., INC., with office at 250 Gibraltar Road,

Horsham, PA 19044, or its nominee, as Assignee.

## WITNESSETH

1.  SUBJECT OF ASSIGNMENT.  Upon and subject to the terms and

conditions herein contained, Assignor agrees to assign, and Assignee agrees to assume, a

certain Contract (hereinafter "the Contract") dated October 17, 2005 by and between

Herman W. Freihofer and Leo T. Freihofer, Jr. as Trustee of the Leo T. Freihofer Jr.

Revocable Living Trust, as Sellers and Ronald M. Scheckter, as Purchaser, for the

Property described herein (the "Property").  The document described above is annexed

hereto and made a part hereof as Exhibit A:

2.  CONTRACT ASSIGNMENT. Simultaneously with the execution of this

Assignment Agreement, the parties shall execute a formal Assignment of the contract (the

"Assignment") which is to be assigned under the terms of this agreement.  The same will

be held in escrow by Assignor's attorney.  It shall be released to the Assignee, together

with the original underlying contract, simultaneously with the delivery of the purchase

price.  Until Closing and the delivery of the Assignment to Assignee, Assignor shall

remain the contract purchaser under the Contract.

3.  TERMS AND CONDITIONS OF CONTRACT TO BE ASSIGNED.

3.1  The Assignee acknowledges and represents that the Assignee is fully

aware of the terms and conditions of the contract which is to be assigned under the terms

of this Assignment Agreement and that the Assignee is entering into this Assignment Agreement based solely upon its own review and understanding of the terms of the contract to be assigned and not upon any information, data, statements or representations, written or oral, as to the terms of the contract given or made by the Assignee or its representatives, except as expressly set forth in this Assignment Agreement..

3.2    The Assignor and Assignee agree that this Assignment Agreement may contain promises of performance by and between the Assignor and Assignee which are not contained in the Contract and are in addition to the obligations of the Purchaser in the Contract which is being assumed by the Assignee.  By execution of this Assignment Agreement, the Assignee agrees to perform the covenants in Sections 4(d), 4(e), 4(f) and 4(g) of the Contract .

4.    DUE DILIGENCE.

4.1    Upon execution of this Assignment Agreement, the Assignee shall be entitled to exercise Assignor's right of entry upon the premises as provided under the Contract.

4.2    Assignee shall have until February 28, 2006 to conduct such "due diligence" inspections of the property as may be required by the Assignee which shall include, and shall not be limited to, the review of all municipal records of the Town of Unionvale related to the property.

4.3    Prior to, and not later than, February 28, 2006, the Assignee may cancel this Assignment Agreement without explanation.  Any cancellation must be in writing and must be received by the Assignor's attorney, Kenneth M. Stenger, Esq., on or before February 28, 2006.

4.4    In the event that the Assignee shall cancel this Assignment Agreement under the provisions of this paragraph, the Deposit paid hereunder shall be immediately returned to Assignee and Assignee shall, deliver to the Assignor, without warranty, all work product, including, but not limited to, surveys, studies, phase one environmental studies and time reports compiled by Assignee during the conduct of its due diligence, together with proof that each and every expense incurred by the Assignee in connection with that exercise has been paid and any monies paid hereunder shall be returned to the Assignee in satisfaction of each parties' obligation to the other under this Agreement.

5.    PURCHASE PRICE.

5.1    The purchase price (the "Purchase Price") for the Property shall be Nine Million Six Hundred Sixty Thousand Dollars ($9,660,000) assuming the Property yields Two Hundred Sixty (260) fully-approved, single family residential units, consisting of one hundred eighty (180) 34-foot wide townhouse units ("Townhouse Units"), and eighty (80) detached single family lots having a minimum area of 5,000 square feet (each, a "Lot", and together with the Townhouse Units, the "Units"). The Purchase Price shall be increased or decreased, as appropriate, by an amount equal to Thirty Five Thousand Dollars ($35,000) per Townhouse Unit for each fully-approved Townhouse Unit more or less than one hundred eighty (180) which the Property yields, and Forty Two Thousand Dollars ($42,000) per Lot for each Lot more or less than eighty (80) which the Property yields. In no event shall the purchase price be less then FOUR MILLION FIVE HUNDRED and 00/100 DOLLARS ($4,500,000.00). In the event that the approvals received result in a purchase price less than the minimum price of $4.5 Million Dollars than, the Assignee shall have the option of either proceeding with the Contract at the

3

purchase price of $4.5 Million Dollars or terminating this Assignment Agreement. In the event that Assignee elects to terminate this Assignment Agreement, the Deposit shall be returned to Assignee, subject to the provisions of Paragraph 5.2 (a).

5.2    The Purchase Price shall be paid as follows:

(a)    Upon the full execution of this Agreement, Assignee shall deliver to Vergilis, Stenger, Roberts & Partners, as escrow agent (as hereinafter defined), Assignee's check in the amount of Two Hundred Thousand Dollars ($200,000) (such amount and any interest thereon shall hereinafter be referred to as the "Deposit") to be held in escrow until Closing (as hereinafter defined) or the earlier termination of this Agreement. Assignee shall have the option of posting the Deposit in the form of a letter of credit in form and substance and issued by a financial institution reasonably acceptable to Assignor. In the event that the Contract is terminated by Assignee after 730 days of its effective date, the Assignee shall be entitled only to the return of $100,000.00 of the Deposit paid hereunder. The Assignor shall be entitled to retain the balance of the Deposit in consideration of its execution of this Assignment Agreement.

(b)    At Closing, if the Purchase Price is $9,000,000 or greater, Assignee shall pay to Assignor one half of the Purchase Price, subject to all adjustments as provided herein, by certified or title company check or by wire transfer of immediately available funds. If the Purchase Price is less than $9,000,000, the cash portion of the Purchase Price payable at Closing will be $4,500,000, and the balance of the purchase price shall be paid by execution of a Purchase Money Note & Mortgage by Assignee in favor of the Assignor. The Deposit shall be paid to Assignor and credited to this payment at Closing.

(c)    The balance of the Purchase Price shall be payable by Assignee's promissory note delivered to Assignor at Closing (the "Note" ), which shall be non-interest bearing for the first two years of its existence and which shall thereafter bear interest at a rate of prime plus one percent which shall be paid in quarterly installments. All amounts due under the Note secured by the Property shall be due and payable on the fifth anniversary of the date of Closing. The Note shall be secured by a first lien mortgage on the Property. The form of Note and Mortgage shall be reasonably acceptable to both Assignee and Assignor. The Note and Mortgage shall also provide that:

(i)    In connection with the conveyances of Units and Lots to third-party purchasers, Assignee shall be entitled to a release for a Townhouse

Unit or a Lot for a payment equal to the "Per Lot Release Price", without the need to pay a release fee or other payment, except the payment of all outstanding interest accrued as of the date of the release, provided, however, that the Assignee shall not be in default of any provision of the Purchase Money Note & Mortgage. For purposes hereof, the Per Lot Release Price shall be an amount equal to:

1.25 (Purchase Price - the cash amount paid at Closing/# of Lots yielded by the Property). For example, if the Purchase Price is ($9,660,000 based on 260 Units, then the Per Lot Release Fee would equal 1.25 ($4,880,000/260), or $23,461.

Further, Assignee shall have the right to prepay the Note, or any part thereof, at any time and from time to time, without penalty or premium.

(ii)     The Mortgage and Note shall contain grace periods, after written notice from Assignor to Assignee of not less than thirty (30) days, and shall also provide that Assignor will execute, acknowledge and deliver, without cost, any release or subordination required by the Town of Unionvale in connection with easements for or dedications of utilities, streets, open or recreation space, common areas, basins or other public improvements laid out on the Property from time to time;

(iii)    All costs (including Assignor's attorney's fees, if any) in connection with Mortgage, such as preparation of the mortgage and release documents, survey, mortgage tax and recording fees, shall be borne by Assignee except that the principal amount of the debt secured by the Purchase Money Note & Mortgage shall be reduced by the amount of the mortgage tax paid by the Assignee; and

(iv)     In the event of a foreclosure of same, the cost of foreclosure, including attorneys fees incurred by the mortgagee, shall be paid by the mortgagor; and

(v)      Assignee shall hold harmless and defend mortgage from any environmental claim against the Property related to an event occurring during the life of the Purchase Money Note & Mortgage and shall execute such document as may be reasonably necessary to commemorate such obligation.

(d)    At the closing of title, the Assignee, at its sole cost and expense, shall provide a title insurance policy which shall insure the status of the Assignor as a holder of a first position Purchase Money Mortgage in the principal amount executed by the Assignee upon the event of closing.

(e)    The Assignee shall pay the purchase price of the Contract to the Contract Vendor and shall receive a credit against the Purchase Price due under this Assignment Agreement.

(f)    The Assignee, in addition to the purchase price, shall be responsible for the payment of all adjustments required under the Contract, including the payment of any Contract extensions as provided under Paragraph 4B of the Contract. However, Ronald Scheckter shall be responsible for the payment of the expenses of the first Contract extension requested under Paragraph 4(b) of the Contract. Either party may request an extension under such paragraph.

6.    CLOSING:

The closing of this Assignment of Contract agreement shall take place under the terms and provisions contained in Paragraph 5 of the Contract.

7.    NOTICE OF DEFAULT AND REMEDIES.

7.1    No default shall be declared by one party against the other until either party has served upon the other party a written 30-day notice to cure of any breach of this contract alleged by the same.

6

7.2     In the event that the Assignee shall breach this Contract in any manner than the deposit shall be retained by the Assignor as Assignor's sole and exclusive remedy for such breach, as liquidated damages.

7.3     In addition to any other claim the Assignor may have against the Assignee, the Assignor shall have a claim against the Assignee for any payment due and owing under Paragraph 13.2 of this Assignment Agreement. Further, Assignor may retain any work previously paid for by Assignee under such paragraph. The provisions of this Paragraph shall apply whether this Assignment Agreement shall be terminated by Assignee's breach or cancellation of the same.

7.4     Assignee shall owe the Assignor a duty to honor any obligations under the Contract assumed by Assignee under the terms of this Agreement. Any breach of the said obligations under the Contract assumed by Assignee shall be deemed a breach of this Agreement. Upon that event, the Assignor shall have the right, in addition to any remedy available to it under this Agreement, to cure Assignee's breach, terminate this Agreement and proceed under the assigned Agreement as if it were never assigned. The exercise of this right shall not be deemed a waiver of any other right or remedy available to the Assignee under this Agreement.

8.     INDEMNITY. The Assignee shall defend, indemnify and hold harmless the Assignor from all loss, expense (including reasonable counsel fees), damage and liability resulting from (i) any claim made by the contract vendor against the Assignor with respect to the obligations assumed by Assignee under Section 3.2 of this Assignment Agreement, (ii) claims of Mechanic's Liens and material men based upon the work performed on or at Property at the request of Assignee, (iii) claims of whatever nature

(including without limitation, for bodily injury, wrongful death, or property damage) against Assignor based upon causes of action which arrives or accrue prior to the closing of title under the contract assigned under this agreement which shall arise solely as a result of Assignee's actions. The provision of this paragraph shall survive the closing of the contract which is assigned by this Agreement.

9.    BROKER. Assignee and Assignor mutually represent to each other that no brokers, agents or finders brought about this Agreement or the conveyance of the Property to Assignee pursuant hereto, except for Kevin McGrath/McGrath Realty, whose commission shall be paid for by Seller. Assignee and Assignor each agree to indemnify and hold the other harmless from and against any liability arising from a breach of the above representation.

10.    ASSIGNOR'S    REPRESENTATIONS,    WARRANTIES    AND COVENANTS.  Assignor covenants, represents and warrants to Assignee both as of the date of this Agreement and as of the date of Closing as follows:

(a)    Assignor is currently the contract vendee of the Property pursuant to the assigned Contract. Assignor is not currently in default under the assigned Contract and, to the best of Assignor's knowledge, there is no uncured default by the Owner, as Seller, under the assigned Contract. The assigned Contract has not been terminated, discharged, modified or amended in any way, and it is in full force and effect. The assigned Contract and, to the best of Assignor's knowledge, the Property is not subject to any lease, option, right of first refusal or agreement of sale. Further, the assigned Contract represents the entire agreement between Assignor and the Owner, and there are no other agreements between Assignor and the Owner regarding the Property.  Assignor hereby agrees to perform all of its obligations under the assigned Agreement, in accordance with the terms and conditions of the assigned Agreement.  Assignor will immediately notify Assignee in writing if any default occurs under the assigned Agreement, or if any event occurs, which with the passage of time would be a default under the assigned Agreement. During the Due Diligence Period, Assignor shall provide to Assignee a collateral assignment of the

8

Underlying Agreement, which assignment may be exercised in the event of a default by Seller under the Underlying Agreement. Said assignment shall be executed by Owner indicating its consent to the assignment and Owner's agreement to send copies of all default notices to Buyer, as well as Seller.

(b)     Assignor has the full power and authority to execute, deliver and perform this Agreement and all agreements and documents referred to in this Agreement or contemplated hereby; no consents of any third party are required. This Agreement is binding and enforceable against Assignor in accordance with its terms. The person who has executed this Agreement on behalf of Assignor has the authority to do so.

(c)     There is no action, suit or proceeding pending or threatened against or affecting Assignor or the Property or relating to or arising out of the ownership of the Property or this Agreement or the transactions contemplated hereby, in any court or before any federal, state, county or municipal department, commission, board, bureau, or agency or other governmental instrumentality, including without limitation, general or special assessment proceedings of any kind, or condemnation or eminent domain actions or proceedings of any kind. There is no insolvency or bankruptcy proceeding pending or, to the knowledge of Seller, contemplated involving Assignor or any of the members of Assignor as debtor or affecting or involving the Property.

(d)     The entering into of this Agreement, the consummation of the sale of the Property, and the conveyance of the Property to Assignee, has not and will not constitute a violation or breach of any of the terms of any contract or other instrument to which Assignor is a party or to which Assignor or the Property is subject.

(e)     To the best of Assignor's knowledge no portion of the Property contains petroleum or any substance which may be classified as a hazardous, toxic, chemical or radioactive substance, or a contaminant or pollutant (collectively, "Hazardous Substances") under applicable federal, state or local law, ordinance, rule or regulation ("Applicable Laws") or which may require any cleanup, remediation or other corrective action pursuant to such Applicable Laws and no portion of the Property has been used by Assignor or any other party for the use, disposal or storage of Hazardous Substances. Further, no underground storage tanks are located at the Property.

(f)     No portion of the Property is located in an area designated by any governmental entity as a flood hazard area.

(g)    There are no commitments or agreements which would require Assignee to pay any money or perform any obligation or which would otherwise affect the ownership or development of the Property by Assignee, except as set forth in the Contract assigned by this Agreement

(h)    Assignor is currently the contract vendee of the Property pursuant to the assigned Contract. Assignor is not currently in default under the assigned Contract and, to the best of Assignor's knowledge, there is no uncured default by the Owner, as Seller, under the assigned Contract. The assigned Contract has not been terminated, discharged, modified or amended in any way, and it is in full force and effect. The assigned Contract and, to the best of Assignor's knowledge, the Property is not subject to any lease, option, right of first refusal or agreement of sale. Further, the assigned Contract represents the entire agreement between Assignor and the Owner, and there are no other agreements between Assignor and the Owner regarding the Property. Assignor hereby agrees to perform all of its obligations under the assigned Agreement, in accordance with the terms and conditions of the assigned Agreement. Assignor will immediately notify Assignee in writing if any default occurs under the assigned Agreement, or if any event occurs, which with the passage of time would be a default under the assigned Agreement. During the Due Diligence Period, Assignor shall provide to Assignee a collateral assignment of the Underlying Agreement, which assignment may be exercised in the event of a default by Seller under the Underlying Agreement. Said assignment shall be executed by Owner indicating its consent to the assignment and Owner's agreement to send copies of all default notices to Buyer, as well as                                                                          Seller.

(i)    At Closing, Assignor shall deliver to Assignee a complete set of Assignor's Plans, including, without limitation, one (1) complete set of mylar reproducibles and one complete set of blueprints of the approved subdivision plans, including all construction drawings, grading plans, etc. and one complete set of Assignor's Plans on computer disk, which shall have been paid for in full by Assignor and which shall be free and clear of liens. All easements required for the Project shall be depicted on the final subdivision plans. Further, at Closing, Assignor shall deliver to Assignee an assignment of all of Seller's right, title and interest in and to Assignor's Plans, including, without limitation, the approved subdivision plans, free and clear of liens and encumbrances, which assignment shall also be executed by the engineer or consultant which prepared Assignor's Plans.

11.    OPERATIONS PENDING CLOSING. Between the date of execution of this Agreement and the date of the Closing:

10

(a)     Assignor shall maintain the Property in its present state of repair and in substantially the same condition as on the date hereof.

(b)     Assignor shall not enter into any lease, agreement of sale, option, or any other agreement or contract affecting the Property, nor shall Assignor grant any easements or further encumber the Property, without the prior written consent of Assignee.

(c)     Assignor shall comply with all covenants, conditions, restrictions, laws, statutes, rules, regulations and ordinances applicable to the Property.

(d)     Assignor shall not use, manufacture, store, generate, handle, or dispose of any Hazardous Substances, or use or permit the Property to be used for such purposes, or emit, release or discharge any such Hazardous Substances into the air, soil, surface water or groundwater comprising the Property.

(e)     Assignor shall not remove or damage any structures, fixtures, systems, improvements, standing trees, shrubbery, plants, landscaping or soil now in or on the Property during the term of this Agreement. Assignor shall not, nor permit others to, dispose of any trash, debris, building materials or organic material (including without limitation trees and stumps) on the Property. In the event such disposal has occurred prior to the date hereof, Assignor shall remove all such materials at Assignor's expense prior to the Closing.

12.   CONDITIONS TO ASSIGNEE'S OBLIGATIONS.

(a)     Assignee's obligation to complete Closing under this Agreement is expressly conditioned upon the following, and Assignee shall have the further right, exercisable at any time and from time to time, to waive any one or more of such conditions without affecting any of Assignee's other rights, conditions or obligations:

(i)     all representations and warranties of Assignor herein being true and correct at the time of such Closing; and

(ii)     Assignor having performed all of its covenants and obligations hereunder; and

(iii)     the receipt by Assignor of unappealable Final Subdivision Approval in sufficient unit count and mix to generate a purchase price of no less than $4.5 Million Dollars, as calculated under the provisions of Paragraph 5.1 of this Assignment Agreement; and

11

(iv)    the receipt by Assignee from Assignor of evidence satisfactory to Assignee to the effect that, at assignee's cost, electric and other utilities are available at the Property, all at connecting fees and expenses that are not greater than those which are customary and ordinary for similar developments in Dutchess County and which are to be paid by Assignee; and

(v)    the receipt by Assignor of all ancillary permits and approvals required by the Final Subdivision Approval, such as Army Corps permits, local environmental board approvals, Department of Transportation approval and the like, which permits and approvals shall be unappealable.

(b) If on or before the date of Closing all contingencies and conditions specified herein are not or cannot be satisfied, then Assignee shall have the option of (i) completing Closing hereunder if it so chooses at the Purchase Price (adjusted for the number of Lots for which Assignee has obtained preliminary approval, or if Assignee has not obtained approval, based on the number of Lots depicted on the applications then pending before the local planning board or (ii) terminating this Agreement in which case this Agreement shall become null and void and the Deposit shall be returned to Assignee, subject to the provision of Paragraphs 5.2(a), 7.3 (d) and 13.4 of this Agreement. In the event of a failure of the condition set forth in Section 12 (a)(i) or 12 (a)(ii), Assignee shall be entitled to treat such failure as Assignor's Default entitling Assignee to exercise the remedies set forth in Section 7 above.

(c) In the event that Paragraph 4(b) of the Contract shall be satisfied and Paragraph 12 (a)(v) of this Agreement shall not be satisfied and the Contract Vendor shall require that the assigned Contract be closed, then, in that event, the parties shall close under Paragraph 5.2 of this Agreement and upon the following terms and conditions:

i.    Assignee shall pay the purchase price of the underlying Contract.

ii.    Assignee shall execute a Purchase Money Note & Mortgage in favor of Assignor for the balance of the purchase price which shall be guaranteed by Toll Bros., Inc. and delivered to Assignor. Assignee shall pay Assignor's attorney a reasonable fee for the cost of preparing the same. Assignor shall have the right to record the same at his sole expense including the payment of mortgage tax and recording fees.

iii.    The Purchase Money Note & Mortgage shall be interest free until Paragraph 12 (a)(v) of this Agreement is satisfied at which time

the principal amount secured by such Purchase Money Note &

Mortgage shall be paid down by assignee in an amount described at Paragraph 5.2(b), interest shall accrue as provided under 5.2 (c), and the terms of the Purchase Money Note & Mortgage shall be deemed modified to conform with all of the terms described at Paragraph 5. The parties shall execute any document reasonably necessary to effect that result.

**iv.** The Purchase Money Note & Mortgage shall contain provision that the amount secured by the same shall be reduced in the event that any lot or unit, upon which the price was calculated, shall be eliminated during the process required to satisfy Paragraph 12 (a)(v) of this Agreement.

(d)  In the event that the parties shall proceed under Sub-paragraph (c) of this section, and in the event that Paragraph 12 (a) (v) of this section is not satisfied by the 2nd anniversary of the event of such performance, then, upon that event:

i.  At the option of Assignee, the two (2) year deadline may be extended by one (1) year; or

ii.  On thirty (30) days written notice by either party to the other, the premises shall be placed upon the open market for sale at the highest possible price.  After the payment of expected and ordinary costs of the sales transaction, the first $1.75 Million Dollars of the sales proceeds shall be paid to the Assignee together with a reimbursement to it for all property taxes paid by it and any other payment made by it ~~under Paragraph 13.2 of this agreement~~ under the terms of this Agreement. Thereafter the next $2.75 Million Dollars shall be paid to the Assignor. Assignee shall accept no offer of sale which shall not fully fund the obligation of payment to Assignor within six (6) months of its acceptance.  ~~There after~~Thereafter the balance of any sales proceeds shall be divided evenly between the Assignee and Assignor. <u>Notwithstanding the foregoing, in lieu of placing the premises on the market for sale, Purchaser shall have the right, but not the obligation, to satisfy all obligations to Seller hereunder, by paying Seller the sum or $2,750,000, in which event, all of Seller's rights to the Property shall terminate and all of Purchaser's obligations to Seller under this Agreement shall be deemed performed and satisfied.</u>

iii.  In the event that the property is not contracted for sale within six (6) months of its being placed on the market, the Assignor shall have the right to acquire the premises from the Assignee by payment of the sum of $1.75 Million Dollars together with a reimbursement to the Assignee of all taxes paid by it and any other payment made by it under Paragraph 13.2 of this Agreement and any fees paid to Consultants in connection with the approvals for the Property. ~~under the terms of this Agreement.~~

Assignor may exercise this right on thirty (30) days written notice to Assignee which may be given at any time but no later than thirty (30) days after receipt of notice under Section 12(d) (ii) In addition to title to the premises, the Assignee shall deliver to the Assignor all right title and interest in any permit, approval or work either received or prepared by it in connection with its performance under this Agreement free and clear of the claim of interest or payment from any third party.

13.    APPLICATION FOR DEVELOPMENT APPROVAL.

13.1  Immediately upon the expiration of the Inspection Period, it is the intention of both parties that the Assignor proceed to initiate and obtain the subdivision and other approvals necessary for this project.  The Assignor will process the approvals at the Buyer's expense, pursuant to an Approvals Budget that shall be approved by Buyer during the Inspection Period.  The Assignor agrees to retain professional engineers, surveyors, planners and any other professionals necessary for the approval process (the "Consultants"), which shall be paid for by the Assignee on no less than a monthly basis and which shall be selected by the Assignee on a commercially reasonable and timely basis. During the Due Diligence Period, the parties shall approve a budget for engineering costs related to the approvals.  Both parties shall review and approve for payment invoices from consultants; any objection to an invoice must have a reasonable basis.

13.2  It is the intention of the parties that the Assignor process the approval applications for this project, subject to the Assignee's review and prior written approval of all land plans and applications filed in connection with the permits and approvals for the Property and all modifications and amendments to such applications. Assignee's prior approval shall also be required with respect to any work requested from any of the

14

Consultants. Further, Assignee's consent must be obtained before any condition to approval is agreed to. The Assignor will only process the application. All construction, testing and engineering will be at the Assignee's expense.  Notwithstanding the foregoing, should Assignee direct the Assignor to make material modifications to the land development application for a lesser density or materially different unit mix than that set forth in Section 2 hereof, and such changes are not required to accommodate engineering considerations or to comply with the municipal zoning ordinance, then Assignee shall not be entitled to a reduction in the Purchase Price below $9,660,000. The preceding sentence shall not apply to any changes and corresponding loss of Units required by an approval agency or to accommodate engineering concerns.

13.3   All application, recreation and permit fees incurred in the approval process will be paid by the Assignee when they are incurred, including, and without limitation, any performance bond or municipal escrow required by the Town of Unionvale.

13.4 In the event that the Assignee shall default under the terms of this Contract, or in any other manner terminate the same, the Assignee, in addition to any other obligation owed to Assignor, shall make any and all payments due under the provision of this Paragraph and all work created under the aegis of the same shall belong to the Assignor.

13.5   Assignor shall use continuous diligent efforts in processing the approvals for the property.  In the event that the Assignor shall fail to prosecute the subdivision application for a period of more than sixty (60) consecutive days, except as may be otherwise permitted under the terms of the Contract assigned under this Agreement, then,

upon that event, the Assignee may declare, on thirty (30) days written notice to Assignor, that it shall proceed with the approval application the stead of the Assignor. Notwithstanding the foregoing, the exercise of its right under this provision shall not entitle the Assignee to declare the Assignor a breach of this Assignment Agreement and the terms of the Assignment Agreement shall continue in full force and effect and shall continue to bind the parties to it.

14.     ASSIGNMENT.  This Agreement shall not be assignable by the Assignee to any third party except upon the written consent of the Assignor.  Notwithstanding the forgoing, Assignee shall have the right, without the consent of Assignor, to assign this Agreement to a financial intermediary in a land bank transaction, or to an affiliate of Assignee.

15.     MERGER CLAUSE.   It is understood and agreed that all understandings and agreements heretofore had among the parties hereto are merged in this Agreement which alone fully and completely expresses their agreement.

16.     SUCCESSORS AND ASSIGNS. This Agreement shall apply to and bind the successors and permitted assigns of this respective parties.

17.     MODIFICATION.  This Agreement may not be changed or terminated orally.

18.     CONSTRUCTION.     This Agreement shall be governed by, and construed and enforced in accordance with, the law of the State of New York and without the aid of any canon, custom or rule of law requiring construction against the draftsman.

19.     LITIGATION.     In the event that any litigation arises out of the relationship between the parties created by this Agreement, the Assignor and Assignee agree that the successful party shall be entitled to recover all of its out of pocket expenses including, but

not limited to, reasonable attorney's fees and court costs in addition to the relief granted by the Court. This paragraph shall survive the delivery of the deed.

20.    MISCELLANEOUS.

(a)    As used herein, the phrases "the date hereof" and "the date of this Agreement" shall mean the date of execution by the last party to sign this Agreement.

(b)    If any term or provision of this Agreement or application thereof shall to any extent by invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each other term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

(c)    This Agreement may be signed in one or more counterparts (or with counterpart signature pages) which, taken together, shall constitute a fully executed Agreement and shall be considered a single document. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature to this Agreement. In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

(d)    Assignee and Assignor agree to cooperate with each other and to take such further actions as may be requested by the other in order to facilitate the timely purchase and sale of the Property, and Assignee's development of the Property following Closing. Accordingly, Assignor agrees to execute such other documents reasonably requested by Assignee, including any agreements of easement over other lands now or hereafter owned by Assignor for storm water drainage, utilities or access in connection with such development.

(e)    If any date on which a time period scheduled to expire herein is a Saturday, Sunday or federal holiday, the subject date shall be extended to the next business day.

(f)    Assignor and Assignee each agree not to disclose the Purchase Price to any third parties, other than each parties' respective lawyers, accountants and tax advisors. This provision shall not apply to closing documents which under New York law require the disclosure of the Purchase Price.

(g)    This Agreement has been drafted by counsel for both the Assignor and Assignee, and, accordingly, any ambiguities contained herein shall not be interpreted in favor of or against either party.

(h)    The performance of Assignee and Assignor under the terms of this Agreement shall be each made in a commercially reasonable manner and on a timely basis.

21.    <u>FILING OF A MEMORANDUM OF CONTRACT</u>

21.1    A Memorandum of Agreement shall be executed by the parties simultaneously and filed in the Office of the Dutchess County Clerk at the sole cost and expense of the Assignee at the request of the Assignee.

21.2    A Certificate of Cancellation of the Memorandum of Agreement shall be executed simultaneously with the execution of the Memorandum.  The Certificate of Cancellation shall be delivered to Assignor's attorney to be held pursuant to the terms of this provision.

21.3    In the event of Assignee default, whereby the Assignor shall become entitled to the release of the down payment as a result of Assignee's default under the provisions of this Agreement, or in the event of this Agreement otherwise being terminated prior to its closing, than, on five (5) days written notice to Assignee's attorney, the Assignor's attorney shall cause the Certificate of Cancellation to be filed in the Office of the Dutchess County Clerk.

10.    NOTICES.

10.1    All notices, demands, requests, consents, approvals or other communications (for the purpose of this paragraph collectively called "Notices") required or permitted to be given hereunder to Assignors or Purchaser or which are given to Sellers or Purchaser with respect to this Agreement shall be in writing and shall be sent by registered or certified mail, without return receipt requested, postage prepaid,

addressed as follows, or to such other address as such party shall have specified most recently by like Notice.

<div style="margin-left:2em">

If to Assignor, to:

Ronald M. Scheckter
PO Box 402
Bedford, NY 10506

With a copy thereof to:

Kenneth M. Stenger, Esq.
Vergilis, Stenger, Roberts & Partners, LLP
1136 Route 9
Wappingers Falls, New York 12590
Tel. 845-298-2000
Fax 845-298-2093

If to Assignee, to:

Toll Bros., Inc.
250 Gibraltar Road
Horsham, PA 19044
Attn: Mark J. Warshauer, Esq.
        Vice President and Counsel
Tel. 215-938-8260
Fax 215-938-8255

</div>

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

Ronald M. Scheckter, Assignor

**TOLL BROS., INC.**
Assignee

By: _____
Robert Parmenus
Group President

19